COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker,[*] Judge Malveaux and Senior Judge Haley
Argued by teleconference

RAYMOND J. HAMILTON

v.      Record No. 1091-18-4

PRO-FOOTBALL, INC., t/a
  THE WASHINGTON REDSKINS AND
  GREAT DIVIDE INSURANCE COMPANY[1]

OPINION BY
CHIEF JUDGE MARLA GRAFF DECKER
FEBRUARY 12, 2019

FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

Benjamin T. Boscolo (Chasen Boscolo, on brief), for appellant.

Benjamin J. Trichilo (Eric J. Berghold; McCandlish Lillard, P.C., on brief), for appellees.


Raymond J. Hamilton (the claimant) appeals a decision of the Workers' Compensation Commission denying his claim for wage loss benefits for an injury that he sustained while on the practice squad of Pro-Football, Inc. (the employer), trading as the Washington Redskins.  He contends that the Commission erroneously found that he failed to market his residual capacity and unfairly punished him for attempting to return to playing professional football after his injury instead of immediately seeking other employment.  We hold that the evidence supports the Commission's decision.  Consequently, we affirm the denial of benefits.

---

[*] On January 1, 2019, Judge Decker succeeded Judge Huff as chief judge.

[1] The opinion from the Commission references the appellees as Washington Football, Inc., t/a Washington Redskins and Great Divide Insurance Company.  As the appellant and the appellees have consistently referred to the appellees as Pro Football, Inc., t/a Washington Redskins and Great Divide Insurance Company, we will adopt that reference.

## I. BACKGROUND[2]

The claimant sustained a compensable injury by accident on December 18, 2015, while working for the employer. He returned to work in a different field on October 3, 2016. He sought temporary total disability benefits for the period of December 18, 2015, through October 2, 2016.

The evidence introduced at the hearing before the deputy commissioner establishes that the claimant fractured a bone in his right foot on December 18, 2015, while he was serving as a player on the practice squad of the employer's football team. The injury rendered him unable to play football.

As a result of the injury, the claimant had two surgeries on his foot.[3] He also underwent rehabilitation at several locations during the nine months following the injury. The claimant initially had rehabilitation at the employer's training facility five to six days per week until mid-January 2016, when his practice squad contract expired. He then underwent rehabilitation with the employer's staff two to three days a week for the last two weeks of January. No evidence in the record indicates the length of these sessions.

Beginning in February 2016, the claimant engaged in rehabilitation in Iowa, Michigan, and Texas.[4] While in Texas, the claimant underwent rehabilitation three days a week for one to two hours per day. Nothing in the record documents the frequency or duration of the claimant's rehabilitation sessions while in Iowa or Michigan. In mid-August 2016, the claimant began

---

[2] On review of a challenge to the sufficiency of the evidence, the appellate court "view[s] the evidence in the light most favorable to . . . the prevailing party before the [C]ommission," in this case the employer. Allen v. S. Commercial Repair, Inc., 40 Va. App. 116, 121 (2003).

[3] The claimant had surgery in December 2015 and April 2016. He used crutches and wore a walking boot after each surgery.

[4] The claimant visited family and friends in Iowa and Michigan, and he performed an unpaid externship in Texas.

formal rehabilitation in Virginia. The physical therapy plan recommended rehabilitation two to three times a week for twelve weeks. The record reflects that the claimant participated in the lesser number of zero to two sessions per week, with each session lasting one hour, for six weeks in August and September 2016.

In mid-September 2016, Dr. Robert Anderson "noted complete healing" at the site of the claimant's second surgery and authorized him to "increase . . . activity in regard to" his fracture.[5] Following that visit, the claimant continued physical therapy in Virginia through the end of September 2016.

On October 3, 2016, the claimant began working as a sales representative for Derby Products and Services, a Florida company that distributes chemicals for automotive maintenance, which was operated by the family of a former teammate.

The claimant submitted a claim to the Commission for wage loss benefits for the period between his injury on December 18, 2015, and the date on which he began working for Derby Products. In defending against the claim for benefits, the employer argued in part that the claimant failed to prove that he marketed his residual work capacity.

At the hearing before the deputy commissioner, the parties introduced evidence pertaining to the claimant's education, football career, and attempts to obtain employment during his period of partial disability. That evidence established that the claimant graduated from the University of Iowa in 2015 with a bachelor's degree in communications and a certificate in entrepreneurship. While a student there, he played for the university's football team. The claimant hoped to pursue a career as a professional football player in the National Football League (NFL) upon graduation.

---

[5] Anderson detected a lesion in the claimant's talonavicular joint, but he later opined that this issue was "unrelated to" his compensable metatarsal fracture.

Despite his goal, the claimant was not drafted by a football team upon graduation. The Dallas Cowboys signed him that year as a "free agent" for their ninety-man "offseason roster," but he was cut from the roster in August 2015. The claimant was then "picked . . . up" by the Pittsburgh Steelers for their ninety-man offseason roster, but he was subsequently cut from that roster too.[6]

More than two months after being cut by the Steelers, the claimant signed a contract with the employer to join the Redskins practice squad. The contract entitled him to $6,600 per week and provided that he could be cut at any time. However, in the event of injury, the contract required the team to "carry" him and pay him at the contractual rate through "one week after the [team's] last . . . game" of the season. Two days after signing the practice squad contract, the claimant sustained the injury at issue in this appeal. Per his contract, the employer continued to pay his salary through the first two weeks of January 2016. At the end of those two weeks, his contract expired.

The employer offered extensive evidence regarding NFL employment practices through Eric Schaffer, the team's senior vice president of football administration. Schaffer explained that under league standards, each team has a ninety-man roster during training camp. At the end of August, each team must determine who from the group of ninety will proceed to its fifty-three-man roster for the playing season. During the playing season, in addition to a fifty-three-man roster, each team may also have a ten-man practice squad. Schaffer testified that

---

[6] The claimant injured his back while on the Steelers' offseason roster. As required by NFL rules, he was carried on the injured reserve list for the duration of his injury, which stretched into the regular season. When he had recuperated and was removed from the list, he was immediately cut from the team as permitted by his contract. He earned about $97,250 while employed by the Steelers, due to NFL rules requiring mandatory weekly payments to players on the injured reserve list.

the employer "typically" had "a lot of movement" on its practice squad, "swap[ping] those guys out . . . very regularly."

Schaffer opined that an "undrafted player," like the claimant, was a "long shot" to actually make a fifty-three-man roster. He explained that the claimant was hired for the employer's practice squad in December 2015 despite his poor performance during the tryout because the team "needed the body[,] . . . someone for practice to get [them] through the week," and that the team planned to replace the claimant after that week. Schaffer testified that after the team's season ended in mid-January 2016 and the claimant's contract expired, the employer did not have "any . . . interest" in him.

At the hearing before the deputy commissioner, the claimant conceded that he was not "actively looking for work" between his injury on December 18, 2015, and his return to work on October 3, 2016, because he "thought [he] was going back to play football." According to the claimant, during that time he was "consistently rehabilitating his right foot" and doing "everything in [his] power" to achieve his "goal [of] return[ing] to professional football." The claimant acknowledged that although he was disabled from playing football after his injury, no doctor ever opined that he was "totally incapacitated from all [work] . . . [f]or any period," even after surgery. He testified that while rehabilitating his foot, he "network[ed]" through the NFL Players Association (NFLPA), performed an externship with a sports memorabilia company, and "reach[ed] out to different universities [and] . . . companies." The claimant's job contacts log shows that over the relevant period of almost ten months, excepting the job that he eventually took, the claimant contacted six potential employers—four universities, including the college from which he had graduated; the organization that operates the Military Bowl; and Panini America, the company through which he performed the externship. The claimant unequivocally confirmed that he did "[not] apply[] for actual jobs" with any of those employers. The claimant

further indicated that he did not register with the Virginia Employment Commission or investigate whether the employer had light-duty work available for him. Finally, the claimant said that after accepting that he would not be able to return to professional football due to his injury, he decided that "it was time for [him] to . . . find a way to [make] some money."[7] Consequently, he took the job with Derby Products.

The claimant offered into evidence a labor market survey performed by vocational rehabilitation specialist Mark Dennis. According to Dennis, the report provided a "snapshot" of the jobs available to the claimant as of 2017. The claimant asserted that Dennis' testimony and survey were relevant to show that he met the goal of the marketing requirement for the post-injury period through October 2, 2016, by obtaining a job with Derby Products at the end of that period that "exceeded" his capacity.

The deputy commissioner denied the claimant's request for temporary total disability. On request for review, the Commission agreed with the deputy's assessment that the claimant had a duty to market his residual capacity because he was not totally disabled and failed to prove that he was undergoing extensive rehabilitation at the employer's direction. It also accepted the deputy's assessment that the claimant did not engage in a good faith effort to obtain work.

## II. ANALYSIS

The claimant argues that the Commission should have found, given the claimant's age, education, professional experience, and career aspirations, that he "successfully marketed his residual work capacity." He contends that the denial of benefits unfairly "punish[ed] [him] for trying to remain in professional sports."

---

[7] The claimant testified that he "[o]bviously" had "made some money . . . the year before," and the record indicates that he earned about $127,000 from his work with the Cowboys, the Steelers, and the employer during the 2015 season.

The Workers' Compensation Commission, as the fact finder, "resolves all conflicts in the evidence and determines the weight to be accorded the various evidentiary submissions." Bass v. City of Richmond Police Dep't, 258 Va. 103, 114 (1999). On appellate review, a ruling by the Commission, if supported by credible evidence, is "conclusive and binding as to all questions of fact." See Code § 65.2-706(A); Ford Motor Co. v. Favinger, 275 Va. 83, 88 (2008). This includes the Commission's assessment of "the credibility of the witnesses." Smithfield Packing Co. v. Carlton, 29 Va. App. 176, 179 (1999) (quoting Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894 (1991)). Determining whether an employee has made a reasonable effort to market his residual work capacity also falls squarely within this fact-finding function, and "if the Commission's factual conclusion on that question is supported by credible evidence, it will not be disturbed on appeal." Favinger, 275 Va. at 88.

Pursuant to Code § 65.2-500(A), an employer is required to pay an employee who is totally incapacitated from work due to a compensable injury "a weekly compensation" calculated in the manner set out in the statute. However, where, as here, the employee is not totally physically disabled, the employee bears the burden of proving, as a precondition to receiving such benefits, "that he [has] made a reasonable effort to procure suitable work but [is] unable to market his remaining work capacity." Favinger, 275 Va. at 89 (alterations in original) (quoting Wash. Metro. Area Transit Auth. v. Harrison, 228 Va. 598, 601 (1985)); see Ridenhour v. City of Newport News, 12 Va. App. 415, 416 (1991) (noting that a partially disabled employee need not be "informed by his physician that he may undertake restricted work in order for him to be obligated to . . . market his residual skills").

When determining whether an employee has made a reasonable effort to market his remaining work capacity, the trier of fact should "compare the efforts of the employee" at issue to those of "a reasonable employee in the same or similar circumstances seeking suitable

employment in good faith." Nat'l Linen Serv. v. McGuinn, 8 Va. App. 267, 271 (1989). "What is reasonable in one area, or in one industry, or even in one season might not be reasonable in another." Ridenhour, 12 Va. App. at 417 (quoting Great Atl. & Pac. Tea Co. v. Bateman, 4 Va. App. 459, 467 (1987)). Due to such variations, no "fixed guidelines" exist for determining what constitutes "a 'reasonable effort'" by a claimant to market his residual work capacity. Favinger, 275 Va. at 89 (quoting Bateman, 4 Va. App. at 467). However, some of the factors to be considered include

> (1) the nature and extent of [the] employee's disability; (2) the
> employee's training, age, experience, and education; (3) the nature
> and extent of [the] employee's job search; (4) the employee's
> intent in conducting his job search; (5) the availability of jobs in
> the area suitable for the employee, considering his disability; and
> (6) any other matter affecting [the] employee's capacity to find
> suitable employment.

Id. at 90 (alterations in original) (quoting McGuinn, 8 Va. App. at 272 (footnotes omitted)). The Commission "determines which of these or other factors are more or less significant . . . [in] the particular case." McGuinn, 8 Va. App. at 272-73.

Credible evidence in the record, viewed in light of these standards, supports the Commission's finding that the claimant did not market his residual capacity between the date of his injury and the date on which he returned to work in a different field.

As the claimant conceded in the hearing before the deputy commissioner, he was disabled from playing football after his injury, but no doctor ever opined that he was "totally incapacitated from all [work]" for any period of time, even after his two surgeries. The claimant remained ambulatory and had significant residual capacity. He was able to travel among various locations in Iowa, Michigan, Texas, and Virginia. The claimant was a recent college graduate with a degree in communications and a certificate in entrepreneurship. During his period of partial

physical disability, he completed an unpaid, three-week externship in which he worked with various divisions of a sports memorabilia company.

The claimant engaged in physical rehabilitation for the duration of the period at issue, but the evidence in the record does not provide any indication that the time or effort required for this rehabilitation prevented him from seeking or accepting employment. During his three-week externship, for example, the claimant testified that he underwent rehabilitation three times per week for one to two hours per session. Additionally, except for the time immediately after his injury when he remained employed by the Redskins and underwent more intensive rehabilitation, no evidence in the record establishes that his physical rehabilitation required any greater time commitment than the six hours per week he devoted to it during his externship.

Significantly, when the claimant testified before the deputy commissioner, he acknowledged that he did not "actively look[] for work" before obtaining the job with Derby Products. The claimant did not ask the employer whether it had a light-duty job available for him when his practice squad contract ended and did not register with the Virginia Employment Commission. The claimant testified only that he engaged in "network[ing]" through the NFLPA; completed the unpaid, three-week externship with a sports memorabilia company; and "reach[ed] out to different universit[y athletic departments]" and "companies." He expressly stated that he was not seeking employment and did not "apply[] for [any] actual jobs." See Cty. of James City Fire Dep't v. Smith, 54 Va. App. 448, 455 (2009). The claimant provided no evidence that suitable jobs for him were unavailable in any of the relevant geographic areas, and his labor market survey evidence, although it covered a different period of time, tended to prove that such jobs were, in fact, available. See Favinger, 275 Va. at 90.

Consequently, here, like in Ford Motor Co. v. Favinger, 275 Va. 83, the evidence supports a finding that the claimant "did not make a reasonable effort to market his residual work

- 9 -

capacity; in fact, he made no effort." Id. at 90-91. Instead, like in County of James City Fire Department v. Smith, 54 Va. App. 448, the "claimant waited [almost] ten months to actively seek employment," and thus he was barred from obtaining an award of temporary total disability compensation for that period. Id. at 457. Contrary to the claimant's assertions, the fact that he secured a job beginning on October 3, 2016, that paid him almost as much as his pre-injury average weekly wage does not satisfy the purpose of the Act's marketing requirement. That requirement, in part, is designed to minimize the weekly wage loss experienced by the claimant in order to correspondingly reduce the compensation owed by the employer. See generally Dowden v. Hercules, Inc., 51 Va. App. 185, 198-99 (2008) (*en banc*) (Kelsey, J., concurring) (discussing the duty of a partially disabled worker to seek employment within his capacity in order to mitigate the employer's damages). Here, to the extent possible, the employer was entitled to have those payments minimized during the entire period of the claimant's partial disability for which he seeks compensation benefits.

The claimant argues that the Commission gave insufficient weight to the fact that he was working as a professional athlete when he was injured. See Favinger, 275 Va. at 90. He argues that the unpublished decision of this Court in Norfolk Admirals v. Jones, No. 0050-05-4 (Va. Ct. App. Nov. 1, 2005), which upheld the Commission's award of temporary total disability benefits, compels the conclusion that a different rule applies for professional athletes than for other employees.

This argument fails for two reasons. First, unpublished decisions like Jones are not binding and may be cited only as persuasive authority. See, e.g., Prophet v. Bullock Corp., 59 Va. App. 313, 319 n.3 (2011) (citing Rule 5A:1(f)). Second, we are not persuaded that Jones supports an award of benefits here because the facts are readily distinguishable. The claimant in Jones played on his employer's regular season team. No. 0050-05-4, at *1. When Jones was

injured, his employer's agents closely oversaw an intensive rehabilitation protocol that prevented him from working during the period of time for which he sought benefits and was expected to return him to full employment within six months. Id. at *2, *7. The claimant, by contrast, was a temporary addition to the Redskins' practice squad. He was hired on an emergency basis under an at-will contract, and but for his injury, he would have been employed in that position for only a week. Further, nothing in the record indicates that the employer had any significant involvement in the claimant's rehabilitation protocol after his short-term contract ended. Finally, no evidence indicates that the claimant, after the contract ended, engaged in rehabilitation more frequently than three times per week for one to two hours at a time. Thus, unlike in Jones, the claimant offered no evidence that the intensity of his rehabilitation schedule prevented him from seeking or working in other employment. Consequently, the evidence in this case supports the Commission's decision reaching a result contrary to that in Jones. See McGuinn, 8 Va. App. at 272-73 (recognizing that the Commission determines which factors potentially relevant to a claimant's marketing efforts "are more or less significant . . . [in] the particular case").

The claimant suggests that the deputy commissioner "punish[ed]" him "for not being particularly good at [his] chosen career" and the Commission erred by "endors[ing]" that action "without comment." However, the claimant misperceives the Commission's ruling. It did not punish him for being a bad professional football player. Instead, it made a factual finding that the claimant's failure to market was unreasonable, and it did so in part because he did not prove that his rehabilitation was so time consuming that it prevented him from simultaneously seeking and working in other employment.

For these reasons, credible evidence in the record supports the Commission's findings.

- 11 -

## III. CONCLUSION

The evidence, viewed under the proper standard, supports the Commission's finding that the claimant failed to market his residual work capacity during the period at issue.  Further, the evidence does not establish that the Commission unfairly punished him for attempting to return to professional football instead of looking for other employment.  Consequently, we hold that the evidence supports the Commission's decision, and we affirm the denial of temporary total disability benefits.

<u>Affirmed.</u>